Scott *v.* Yard.

GEORGE W. SCOTT

*v.*

HENRY H. YARD.

1. A question of disputed boundary, where a doubt exists as to the true location of a line, presents a simple issue of facts, which must be determined as any other issue of fact is.

2. In determining such an issue, recourse may be had to every kind of evidence which it is competent to use to prove a fact.

3. Surveyors appointed by the board of proprietors, being their agents, it is proper for the court, in judging of their acts, performed many years ago, and concerning which no oral evidence can now, in consequence of the great lapse of time, be given, to presume that they did that which an ordinarily skillful and proper discharge of their duty to their principals required them to do.

On final hearing on bill and answer and proofs taken in open court.

*Mr. Frederick Parker* and *Mr. William H. Vredenburgh,* for the complainant.

*Mr. Joseph McDermott* and *Mr. G. D. W. Vroom,* for the defendant.

VAN FLEET, V. C.

The complainant claims to be the owner of three lots of land fronting on Ocean avenue, at Brighton, in the township of Wall, Monmouth county. Each lot is described in the deed, by which

it was conveyed to the complainant, as fifty feet wide, front and rear, and one hundred and fifty feet deep. The complainant acquired his title on the 26th day of August, 1880. The lots claimed by the complainant constitute part of a considerable tract of land, lying on the coast near Spring Lake, which in 1879 and 1880 was divided into lots by its owners, and the lots laid off on a map, together with avenues or streets by which convenient access to the lots might be had. This map was filed in the clerk's office of Monmouth county on the 11th day of August, 1880. Ocean avenue, the street on which the complainant's lots front, lies immediately between the complainant's lots and the ocean, so that his lots have an ocean front, with nothing between them and the ocean but the avenue. The defendant disputes the complainant's title to the lots. He claims to own a strip about forty-five feet in width, running through each of the complainant's lots, thus cutting his lots in two parts, leaving to the complainant on the west side of the strip which he claims about seventy-five feet, and on the other side about thirty feet. If the defendant's claim is valid, it will be seen at a glance that he has the complainant in a position where he can make his lots utterly worthless to him for the purpose for which he obtained them, by refusing to sell his strip at any price, or if he should be willing to sell, he can, in consequence of the advantages of his position, compel the complainant to pay him a price for his strip largely in excess of its fair value. The complainant brings this action to have the question settled, whether or not the defendant's claim is well founded. The action is brought under the statute of 1870, authorizing this court, in certain cases, to settle and determine the title to land. *Rev. p. 1189.* The jurisdiction of the court is conceded. The only question the case presents for decision is, in whom do the proofs show the title to the strip in controversy to be.

Both parties claim under the Board of Proprietors of the Eastern Division of New Jersey. The title claimed by the defendant originated in a survey inspected and approved by the surveyor-general as late as the 19th of October, 1880. This survey was made by defendant, as a deputy surveyor of the

board, for himself. His title, if he has any, accrued to him on the 19th of October, 1880. Before that date, if any title existed, it was held by the board of proprietors. The survey made by the defendant, and under which he claims, is what is called an including survey; that is, it embraces lands previously surveyed and appropriated by other persons, and in this instance the survey embraces much more appropriated than unappropriated land. It purports to contain within its lines an area of over one hundred and thirty-eight acres, but admits, on its face, that previous locations cover the whole of it except about eleven acres. The purpose of this method of surveying seems to be to pick up and appropriate any land, whether an inch or an acre, which happens to lie outside of the strict lines of previous locations.

The complainant's title originated in two surveys or locations made more than one hundred years apart. The first tract, embracing the land from which the western part of his lots has been taken, was surveyed and allotted to John Forman, in July, 1746, and the second tract, embracing the land from which the eastern part of his lots has been taken, was surveyed and allotted to Edward Brinley, on the 1st day of October, 1860. It is conceded by the defendant that the complainant's lots, separated, as he claims they are, by an intervening strip, are, nevertheless, in part composed of the land embraced in the two surveys just mentioned. As already indicated, the John Forman tract lies west of the Edward Brinley tract. So it will be perceived that the decisive question of the case is, whether the west line of the Edward Brinley tract, as located October 1st, 1860, ran coincident with the east line of the John Forman tract, or whether the west line of the Edward Brinley tract was so located as to leave between it and the east line of the John Forman tract a strip of land between forty and forty-five feet in width? The defendant contends that an accurate survey of the lands, made in conformity to the calls found in the description of the two tracts, demonstrates, beyond doubt, that such a strip was left; while the complainant, on the contrary, insists, that the court, simply on looking at the character of the land which was taken up when the location of 1860 was made, and seeing where it is situate,

and the purpose for which it was taken up, and by whom it was surveyed, must conclude as a matter of ordinary practical common sense, and in the absence of all direct evidence tending to show that such was the fact, that the west line of the Brinley tract was so located as to run coincident with the east line of the Forman tract.

· · The land taken up in 1860—the Brinley tract—lay between the Forman tract and the sea; it was coast land, consisting principally of sand dunes; it was taken up after many places along the New Jersey coast had become popular as sea-side resorts, and after it was very generally believed by the people living along the coast that land at almost all points on the coast would, sooner or later, become valuable because of its desirability as a place of summer residence; the land was worthless for any purpose other than as a place of summer residence; it was surveyed by Francis Corlies; for eight years or more prior to the time when he surveyed it he had been a deputy surveyor of the board of proprietors; he had resided all his life near the coast, and knew very well in what the value of such land consisted; this tract, as Mr. Corlies surveyed it, has a width, running westward from the sea, of six chains at its southern end and five chains at its northern end. Nothing can be much more certain than that a deputy surveyor, searching for unlocated land at such a point, at the time this tract was located, would be extremely eager to extend his location as far westward from the sea as possible. The farther he went in that direction the more land he would get, and the greater would be the value of the tract he located. It is absolutely certain that he would take up all that he found to be unappropriated. If he left any, it would be a result of mistake and not intention. So that I think it must be regarded as true, as the complainant contends it is, that the proof inherent the character of the land embraced in the Brinley tract, and its situation, and the circumstances attending its location, go very far to demonstrate that the west line of that tract was actually located so as to run coincident with the east line of the John Forman tract. But whether this be so or not, it is clear, that there is enough in these circumstances (if it be true, as the defendant

insists it is, that an accurate survey of the Forman and Brinley tracts shows that there is an unlocated strip between them of over forty feet wide) to raise a strong doubt whether the lines recorded and reported by the surveyors who located them are the lines which they actually ran. And when this is the case, the question presented for judgment is a question of actual location, or rather of the application of the grant to its proper subject-matter, and this is always a pure question of fact, to be determined as other questions of fact are, by resorting to every kind of evidence to which it is competent to have recourse in proving a fact.

The different kinds of evidence which may be used in settling a question of disputed boundary were described by Chief-Justice Green, in pronouncing the judgment of the supreme court in *Opdyke* v. *Stephens, 4 Dutch. 83, 89,* as follows: "The rule is well settled that boundaries may be proved by every kind of evidence that is admissible to establish any other fact. Actual occupation, ancient reputation, the admission of the party in possession against his interest, ancient maps and drafts, marked trees, the lines of adjoining surveys, monuments erected at or soon after the date of the grant of adjoining surveys, are all admissible for this purpose, and are constantly resorted to to fix the boundaries, though it conflicts with the courses and distances called for in the deed. The well-settled principle is, that practical location is evidence of a mistake in the description. The practice, as well as the reason upon which it rests, is stated with admirable clearness and felicity by Mr. Justice Washington in *Connecticut* v. *Pennsylvania, 1 Pet. C. C. 511.* He says : 'No gentleman of the profession who is at all conversant with land trials, can be ignorant that the courses and distances laid down in a survey, especially if it be, ancient, are never, in practice, considered conclusive, but that, on the contrary, they are liable to be materially changed by oral proof or other evidence tending to prove that the documentary lines are not those actually run. How often have we known reputed boundaries proved by the testimony of aged witnesses [and by such evidence] established in opposition to the most precise calls of an ancient patent. Such evidence has been constantly received, and distances have been

lengthened or shortened without the slightest regard to the calls of the patent. The reason is obvious. It is not the lines reported, but the lines actually run by the surveyor which vest in the patentee a title to the area included within these lines. The survey returned on the patent is the evidence of the former, natural marks or reputation is in almost all cases the evidence of the latter. The mistakes committed by surveyors and chainbearers, more particularly in an unsettled country and wilderness, have been so common, and are so generally acknowledged, as to have given rise to a principle of law as well settled as any which enters into the land titles of this country, which is, that when the mistake is shown by satisfactory proof, courts of law, as well as of equity, have looked beyond the patent to correct it.' "

There can be no doubt that the claim of one party or the other to the land in dispute rests on a mistake. The important question is, whose claim rests on a mistake? This is a question, which, in this case must, to a large extent, be determined by probabilities, and they, as I view the proofs, stand strongly opposed to the validity of the claim set up by the defendant. If he is right in his contention that an accurate survey of the two tracts, according to the calls of their respective descriptions, will leave a gap between them of forty feet or more in width, then, it seems to me, the court is bound to conclude, from the proof which is inherent in the circumstances attending the location of the Brinley tract, that the recorded lines of the two tracts are not the lines actually run when those tracts were located. This is unquestionably so as to the Brinley tract if the evidence of Francis Corlies is true. He was examined as a witness for the complainant. He testified that, before making the survey of the Brinley tract, in 1860, he procured copies of the surveys of the adjoining lands; that his object in making that survey was to take up all the unlocated land at that point, and that, in locating the Brinley tract, he was guided by the lines of the adjoining lands, and that he located that tract by making an actual survey of its lines on the ground. He also said that there was no unlocated land west of the west line of the Brinley tract, in other words, that he made the west line of the Brinley tract coincident

with the east line of the John Forman tract. If this evidence is accepted as true, it is manifest that the defendant's claim is without support, except such as a mistake may give it.

But is it true that an accurate survey of the two tracts, from which the complainant's lots have been taken, will leave an unappropriated strip, lying between the west line of the one and the east line of the other? My consideration of the evidence pertinent to that question has led me to quite a decided conviction that it is not. The chain of evidence by which the defendant attempts to show that the strip of land which he claims is not covered by the survey made to John Forman in 1746, nor by the survey made to Edward Brinley in 1860, but was unappropriated when he made his survey in October, 1880, may be sufficiently stated for the purposes of the present discussion, as follows: The first land taken up from the proprietors, lying in the vicinity of the land in dispute, was a tract of two hundred and ten acres surveyed and allotted to the "heirs and assigns" of Hugh Hartshorne on the 7th of February, 1745. This tract was generally spoken of by counsel and witnesses on the hearing as the Hartshorne tract. Its beginning point is known and free from dispute. In the original survey it is described as "a small pine tree, marked on four sides," but is now a stone. The last or closing line of this tract is the only one at all material to this discussion, or which furnishes any evidence tending to support the defendant's claim. Its course and distance, as given in the original survey, are "north, fourteen degrees west, thirty-two chains and fifty links to where it began." In 1813, sixty-seven or sixty-eight years after the location of the Hartshorne tract, a tract lying immediately east of the last-named tract was surveyed and allotted to Andrew Bell. The west line of this tract was located either coincident or parallel with the closing line of the Hartshorne tract. The beginning point and the course and distance of the first line of this Bell tract, are described in the original survey of that tract in these words:

"Beginning at the distance of one chain and fifty links, on a course north, seventeen degrees and fifteen minutes west, from a pine stump, which is the beginning corner of Joseph Morton's land, thence (1) south, seventeen degrees and fifteen minutes east, thirty-four chains."

Joseph Morton was the owner of the northern part of the Hartshorne tract in 1813, the date of the Andrew Bell location. The two lines under consideration were run, it will be observed, in opposite directions—that of the Hartshorne tract was run in a northerly direction, while that of the Bell tract was run in a southerly direction. Now, if we reverse the course of the last line of the Hartshorne tract and thus make it correspond in direction with the first line of the Bell tract, the two will read as follows : the course of the Hartshorne line will be south, fourteen degrees east, and that of the Bell line will be south, seventeen degrees and fifteen minutes east. It is thus seen that the difference in the course of the two lines is three degrees and fifteen minutes, and the interval between the dates when the two surveys were made is between sixty-seven and sixty-eight years. The beginning point of the John Forman tract, as given in the survey of that tract, is " at a stake which is in the nearest corner towards the sea of the Hartshorne tract; " in other words, the beginning point of the John Forman tract is at the end of a line, thirty-two chains and fifty links in length, run from the beginning corner of the Hartshorne tract, on a course south, fourteen degrees east, as the needle pointed in 1745 ; and the beginning point of the Edward Brinley tract, as given in the survey of that tract, is " at the most southerly corner of the Andrew Bell tract; " in other words, the beginning point of the Edward Brinley tract is at the end of a line, thirty-two chains and fifty links in length, run from the beginning corner of the Hartshorne tract, on a course south, seventeen degrees and fifteen minutes east, as the needle pointed in 1813. The claim of the defendant is, that the beginning points of the John Forman and Edward Brinley tracts, as fixed and determined by an accurate survey of the closing line of the Hartshorne tract and the first line of the Bell tract, making proper allowance for variation in the movement of the magnetic needle between 1745 and 1813, shows that they are distant from each other about forty-five feet, and from this it is argued that it necessarily follows, from the separation of these two corners by this distance, that, at the time the defendant made his survey, in October, 1880, there existed a strip of unappropriated

land between them, to which he, by his survey and the subsequent approval of the surveyor-general, acquired a valid title.

This claim constitutes the foundation of the defendant's case. If it is not true, as he insists it is, that the beginning points of those two tracts stand separated from each other, with a considerable intervening space between them, but are in fact coincident or substantially so, then he has no case. Whether they are coincident or separate must, of course, depend entirely on whether the first line of the Bell tract was so located as to run coincident with the closing line of the Hartshorne tract, or so as to establish a new and independent line. Looking at the probabilities of the case—and this is an instance where that must be done, for the transaction under examination occurred over seventy-five years ago—there would seem to be no ground to doubt that it was so located as to run coincident with the closing line of the Hartshorne tract. There can be no doubt, I think, that the deputy surveyor, who located the Bell tract, made his location with full knowledge of the course and distance of the closing line of the previous location. He undoubtedly had a copy of the survey of the Hartshorne tract. It cannot be believed that he would enter upon the work of locating a tract of land adjacent to that tract without a copy. His return shows that he knew where the beginning point of the Hartshorne tract was, for, it will be remembered, he tied the beginning point of the Bell tract to the beginning point of the Hartshorne tract. But what, in my judgment, is most decisive on this branch of the case, is the fact that he made the first line of the Bell tract, so far as the two run together, of exactly the same length of the closing line of the Hartshorne tract. They are both thirty-two chains and fifty links in length. Unless he intended to make the west line of the tract he was locating coincident with the east line of the adjacent tract previously located, the chances were one to many thousand that he would either have stopped short or gone beyond the end of the line already established, and the fact that he made his first line of exactly the same length as a corresponding line of the previous adjacent location, furnishes, as it seems to me,

evidence of the very strongest kind that he meant that his line should run coincident with the line previously established.

Besides, it is important to remember that the person who located the Bell tract was an agent of the board of proprietors. As was said by Chief-Justice Ewing, in *Lippincott* v. *Souder, 3 Hal. 161, 164:* " The running of lines, the fixing of boundaries, in other words, the whole location of proprietary rights, and the ascertainment of the quantity of land in any survey, were always done by themselves, or, what is legally speaking the same, by their agents, the deputy surveyors and surveyor-general. For they suffered no man to select his own agent; their officers he must employ; in none other would they confide." To me it appears to be quite incredible that any person fit to be appointed a deputy surveyor, should, with a copy of the survey of the Hartshorne tract in his hands, have located the Bell tract so as to leave between it and the Hartshorne tract a small strip of land, a few inches in width at its northern extremity and about forty-five feet wide at its southern extremity, or that a survey, having a gap of this kind between it and a previous location, should have received the approval of the surveyor-general. Nor do I think it can be believed that any surveyor, with even a slight knowledge of his duties, would have left a strip of land between his location and a previous one, which, in consequence of its shape and size, would be rendered utterly worthless to his principals. To leave it in the condition in which it existed in 1813 was a practical abandonment of it without compensation. But for a rule of the board of proprietors, prohibiting their surveyors from fixing the location and length of their lines by monuments, and directing them not to mention monuments in the description of lands surveyed by them, except at the beginning point, there can be little doubt, I think, that the surveyor who located the Bell tract would, in describing it, have stated that its west line ran coincident with the east line of the Hartshorne tract.

The proofs, I think, also make it tolerably clear that the surveyor who located the Bell tract meant to run the first line of that tract precisely on the same course on which the closing line

of the Hartshorne tract had been run. The Bell survey, as already stated, was made sixty-seven or sixty-eight years after the Hartshorne survey *had been made.* This lapse of time had made a considerable change in the course which the magnetic needle would indicate, placed at exactly the same point where it had been placed in 1745. There is a difference of three degrees and fifteen minutes between the courses on which the two surveys were made. Is this variation so great, having regard to the period of time which had elapsed between the two surveys, as to make it safe to assume that the surveyor who made the last survey intended to establish a new and independent line, and not to make his line coincident with the one previously established ? On the argument both parties made use of the report of the United States Coast Survey for 1886, showing the secular variation of the magnetic declination in the United States for the period invervening between 1745 and 1813. If we take the three points given in this report nearest to the land in dispute, namely, New York, Philadelphia and Hatborough, Pennsylvania, and calculate the observed variation for the period in question, it will be found that it was two degrees and five minutes at New York, three degrees and forty minutes at Philadelphia and three degrees and seven minutes at Hatborough. So that, according to the data furnished in this report, a course which, in 1745, stood at New York, Philadelphia and Hatborough, south, fourteen degrees east, would, in 1813, stand at New York, south, sixteen degrees and five minutes east; and at Philadelphia, south, seventeen degrees and forty minutes east; and at Hatborough, south, seventeen degrees and seven minutes east. The last line of the Hartshorne tract was run, it will be remembered, in 1745, on a course south, fourteen degrees east, and the first line of the Bell tract was run in 1813 on a course south, seventeen degrees and fifteen minutes east. The difference in the course shown by the two surveys may, I think, be reasonably and satisfactorily explained by the change which sixty-seven years had made in the position of the magnetic needle, to say nothing of the imperfect character of the instruments in use both

in 1745 and 1813, nor of the careless manner in which both surveys were probably made.

The defendant's claim is, in my judgment, groundless. The complainant is, consequently, entitled to a decree that he has a good and indefeasible estate in the land in dispute as against the defendant, and that the defendant has no right to or estate therein. The complainant is entitled to costs.